It's a good day. It's Friday. Happy Valentine's Day, everybody. For our last day this week, we have three cases to hear. We're familiar with your cases, counsel, and read your briefs, the authorities in your briefs, portions of the record at least. So we've only got 15 minutes aside. Get straight to the heart of your argument before we start firing questions. When the red light shines, don't treat it as aspirational, as Judge Edmondson likes to say. But if you're finishing an answer to a question from the court, of course, feel free to finish your answer. United States v. Kim Mr. Finlayson May it please the Court, counsel, as you know, I represent Jon Kim. Jon Kim is present in the courtroom here this morning. I'd like to talk this morning about two issues, the trial court's refusal to give the entrapment charge and the trial court's denial of the motion for new trial based upon the improper introduction of the two transcript portions. I'll take those in reverse order. Mr. Finlayson Well, I think you might want to talk about the entrapment instruction first. Jon Kim Okay, that would be fine. I'll take those in non-reverse order. Mr. Finlayson I think there's some closeness to that issue. I want to make sure I understand kind of what the trial judge had been hearing in making the decision about whether to give that instruction. There had been an event where, as I understand it, the evidence was that Mr. Kim and others decided they were going to go over to the victim's bar, Mr. Lee's bar, to, quote, collect money and at least get some drinks, right? Jon Kim Well, Your Honor, I think the word collect was used and the goal was to go get drinks. Because they were at a restaurant elsewhere and they said let's go drink some more. Mr. Finlayson And the practice had been get drinks without paying for them, right? Jon Kim There was some evidence that drinks had been not paid for in the past. Mr. Finlayson Right. They would go and the evidence was this was Mr. Kim's idea, right? Jon Kim Well, again, they were at a restaurant. They wanted to have more drinks. And one of the guys said, I don't have any money. And there was testimony that Mr. Kim said, well, Jung Soo owes you money, Eugene. Because remember there was a business debt here. Jung Soo Lee purchased the Gabin bar from Eugene Chung and agreed to pay him money. So there was a – everybody in this case testified except for Jung Soo who just flat out lied with all candor that there was a business relationship. And if you don't accept that business relationship, you have to believe Jung Soo Lee was given a bar for free. And that was just impossible. Mr. Finlayson Yeah, I'm just trying to figure out whether there was a real showing here of inducement. Jon Kim I understand. Your Honor, again, as you know, the bar fight, which the jury acquitted my client of, they did not find that was an act of – Mr. Finlayson That's not something the judge knows about when he's deciding to instruct the jury. Jon Kim That's true, but obviously – The only person left is your client, and your client, the evidence was said to him, don't call the police, right? And keep paying – everything's going to be fine if you keep paying money to Chung. Mr. Finlayson The money for the bar. And that was the testimony. And Your Honor – was the testimony clear that that's all he was saying it was for, or was it more ambiguous about what the paying of the money was? Jon Kim Given the surrounding facts and circumstances, that was what was clear to my client, was that this was payment for the bar. And there was – Mr. Finlayson He didn't say that, though, did he? Jon Kim He didn't say that, but otherwise, again, the informant is getting a bar for free. So this happened – that happened in December. We moved to the payments in January. And that is all at the instigation of the informant. And there's no doubt, it's the informant that's calling up Jon Kim and saying, hey, will you deliver this money? I'll give you the money, and my client – was told don't call the police by your client and keep paying the money, and everything will be fine. So as a follow-up to that, he calls, right? Isn't that – I mean, the trial judge hears that, right? Mr. Finlayson With all due respect, there was much more testimony than that. Jon Kim Okay. Mr. Finlayson Brian Kong testified that the person that calmed that fight down, the barman, was Jon Kim. The fact that Jon Kim remained doesn't show more malice, it shows less. The fact – throughout the recordings, when the informant is trying to work Jon Kim – Jon Kim Counsel, we're not dealing with the malice or intent element. The question that Judge Bill Pryor is asking you, and it's a question I have as well, is for purposes of inducement, is it not – and I'll read the testimony. It's from page 150 of the trial transcript. After that, I talked to Jon. Jon said, do not call the police. If you continue to pay Eugene, everything will be fine. I said, okay, and that's it. And then a call happened on January 6th. Jon Kim Call happened on January 6th. He offers the money to Jon Kim. Jon Kim refuses that money. And that is a scintilla of evidence. I have to show – I had to introduce a scintilla of evidence, and that was it. But if the initial suggestion of payment was made by your client as opposed to the government agent, doesn't that defeat the inducement issue? No, sir. That's not the initial suggestion of payment. The initial suggestion of payment happened six months prior to that. Can't the trial judge read that as the suggestion of payment that led to January 6th? Is that an unreasonable reading by the trial judge? With all due respect, I would say yes. And I don't think Judge Batten made – went anywhere near that granular or that deep in deciding the issue. He just – he decided this is not an entrapment case. The government – when I asked for the instruction, the government said, well, that would only apply to counts five and six. And I said, that's the only counts I want it on, because that is where the informant repeatedly contacted my client. My client refused to do it. He initially said, what money? Would it be unreasonable for a trial judge, whether the particular trial judge here did or did not get into, as you quote-unquote say, granular nature of it, that a trial judge found that he said pay the money and then a call was made on January 6th for payment of money to show that your client and not the government was the initiator here? I can't – I will not – can I concede that? I'm not asking to concede it. I'm asking if a reasonable trial judge could view it that way. I don't think that – given all the evidence in the case, I don't think that is the reasonable interpretation. With all due respect, I don't. But Mr. Finlayson, even if we look just at the dialogue that you want to focus on where he says he doesn't care about the money, it's not his, I don't pay attention to it, less than two pages later in the transcript, he says, okay, I'll help you. So I'm not sure refuse – refuse may be too strong a word there. And then in the next call, they just move forward payment of the money and there's no – doesn't seem to be any resistance at all. Well, I've got – all I had to show was a scintilla of evidence and then it becomes a jury question. It's actually not the standard. It's more than a scintilla. More than a scintilla of evidence. Right. And I submit with the repeated calls, the – Well, I mean, so let's – the most really your client says is in terms of a refusal is that he's not involved with money management. Isn't that right? He says it's not mine. I don't care about it. And it's because Yoon Soo is trying to get him to take it. This is not where John Kim is calling up Yoon Soo to say, hey, please give me the money so I can give it to Eugene. This is – he's not trying to encourage this in any way. This is all instigated and induced by the government informant. Let me ask you this, counsel. Let's assume that I disagree with you about a reasonable trial judge reviewing the December – the testimony about the December meeting and then what happened in January. Even taking that at its face, is there anything to be said for your point of view that the statement that I just quoted from is your client telling the cooperating witness here to pay Eugene and then the January call he's offering your client the money, meaning I want you to take it. Do you want it? Do you want the money? Is there a difference to be read into that, even reading the – even getting more import to the transcript than you would give it? I'm not sure, to be honest. I'm having – I don't quite understand your question. Okay. I'm sorry. In December, the testimony is this, that after your client – after the cooperating witness got beat up and your client spoke to him, your client said, after that I talked to John. John said, do not call the police. If you continue to pay Eugene, everything will be fine. And he said, okay. Fast forward to January 6th of 2010. Your client says, essentially, I'm summarizing, hey, here's money. I have $500. You can keep it or you can give it to whoever. Is that a substantive distinction between you need to pay Eugene versus the offer here, which is not to pay Eugene but to you can keep whatever you want out of the $500? I think if I understand your question, I think that helps me. In other words – Well, tell me why. I think maybe two, but tell me why. The reason why would be because the message in December was pay Eugene the debt you owe him, which does not show motive to extort. It shows trying to make the peace. Pay him what you owe, whereas in January, it's a different – it's a break. It's a different – it's suddenly suggesting a different relationship. Hey, here, you take the money, which is different than December. So I like that point, I think. It shows a motive to extort, though it shows aiding and abetting an extortion, doesn't it? Isn't that the problem? That's the problem with the point I made is this is a Section 2 case. Well, the problem is, though, John Kim was always aiding and abetting Jung Soo Lee. It was always, please help me, brother. Do this for me, brother. It was not – he was not aiding and abetting Chung. He was abetting Jung Soo because Jung Soo was asking him to please help me, please do this for me. It was not – it was not – he was not doing it for Chung, and it was not to his own benefit. Can I just briefly talk about the other issue? I think those transcripts really quickly come into evidence. I think the government has now conceded, and we are at a place where there is a presumption of prejudice. Once we're – when we're out of the waiver debacle, once we're out of that discussion, we're at a presumption of prejudice. I read the record. And the government – I thought it was properly admitted, but, you know, it looked like it was admitted to me. But you preserved this. And I just would say there's a presumption of evidence – a presumption of prejudice which must be rebutted and has not been rebutted. Judge Batten's entire ruling below was based on a premise that there had been a waiver. So they cannot – I'm out of time. All right. Thank you. Thank you. You've saved four minutes for rebuttal. Ms. McBath. Ms. McBath, before you get started, I've got to tell you. You know, when a case is set for oral argument, I don't start working on it yesterday. So I get a letter on the eve of oral argument that says, you know, all that stuff, like several pages in the brief, it's all complicated in the record, you know. Don't worry about that anymore. I've already figured it out by then, probably, or at least have a pretty good idea and have some questions about it. You know, that's not especially helpful to me. I can only speak for myself, you know. It could be helpful if, you know, it's further in advance. But on the eve of oral argument, you know, to get that, you know, just as a practice pointer, that's not very helpful. Okay. I understand, Your Honor, and I apologize to this Court for the timing of the letter. I will say that we, once the office as a whole started looking at the issue . . . You can start the time. Yeah, go ahead. We felt like the right thing to do would be to concede error. We . . . I didn't even read it as a confession of error, but go ahead. You said you're not relying on that anymore. Right, that we would not hold the defendant to his burden because we took what he said in the reply brief to heart. It's very important to us as an office, as an institution, that defendants and defense attorneys can rely on what we're saying. And it was decided as an office, this wasn't me, this is me.  And so I understand . . . But you can report this back to the office. And I was certainly a part of those conversations. I'm not trying to . . . Oh, I understand. And Judge Crier, I don't want to speak for him, but I think I will here, is not being critical of that decision. What he's being critical of is this conversation seemed to have happened very late in the day. And I echo him that we have weeks to prepare for this, and to get to the last minute obviously changes our preparations and makes it more difficult for us. I completely understand, and I apologize, Your Honor. So I would like to . . . So given that you've conceded error, where are we? Well, we are on the question of whether or not the district court abused its discretion in finding that the error was harmless beyond a reasonable doubt. And the answer to that question is no. And I would like to address entrapment unless this court would like for me to go into why the error was harmless beyond a reasonable doubt on the first issue. I apologize. Are you conceding that the evidence was highly prejudicial? Absolutely not. We are not conceding that it was highly prejudicial. We are . . . Our argument is that it was minimally prejudicial. Our argument is exactly what the district court found. So the district court, in denying the motion for new trial, the holding was that the defendant's substantial rights were not affected, that this was harmless beyond a reasonable doubt, that the admission of Parts 2 and 3 did not affect the verdict. And there are two reasons for that. One, that the parts of 2 and 3 that the defendant takes issue with were minimally prejudicial. And the other reason is that the other evidence that came in was absolutely overwhelming as to the defendant's guilt. And with respect to what that overwhelming evidence was, the jury heard that there was a gang, that this was a gang that engaged in a lot of illegal activity, that the defendant and Mr. Eugene Chung were the two leaders of this gang, and that this gang tried to make people scare them. The evidence showed in great detail . . . But the jury acquitted Mr. Kim on counts 1 and 3. They did. When looking at the overwhelming evidence and analyzing whether or not there was abusive discretion in denying the motion for new trial, this court must look at the evidence as a whole. So the fact that the Supreme Court tells us that the fact that there was an acquittal on counts 1 cannot be taken into account when looking at the overwhelming evidence as to counts 5 and 6. And that's true even if there appears to be a logical inconsistency in the verdict. I looked back, and it looks like the jury deliberated for seven or eight hours before they reached a verdict. So how can we say there was no reasonable possibility of prejudice here? Because we are not even allowed under the law to engage in suppositions and hypotheticals as to what the jury was doing. We have no idea, and we can't make any assumptions from the length of time or even the fact that there was an acquittal on some counts. And so the overwhelming evidence looking at the record as a whole shows that there was a gang, shows that this gang was violent, shows that this gang wanted to scare people, and shows that the defendant was one of the leaders of this gang. Now, we know in particular that they scared Mr. Yoon Soo Lee, and we know what happened on December 16th on the assault. There doesn't seem to be any factual dispute as to what happened there. Mr. John Kim encouraged his group to go and collect money from Yoon Soo Lee that night. So are we under the entrapment now? Oh, now I was talking about overwhelming evidence on the motion for new charge. I don't want to interrupt you there, but I'm anxious to get to the entrapment issue. Sure, absolutely. All right, so with entrapment, we are now under de novo, standard of review, and the district court did not err in refusing to give the entrapment instruction here. So put aside for the moment the statement that I read and that Judge Bill Pryor was talking about regarding what happened at the December meeting. Pretend for a moment that that never happened, the statement of Pei Eugene. Okay. And we just have starting this, the general gang involvement like you talked about, and the January 6th call. Right. Would the January 6th call be problematic for you under that factual circumstance? It would not be in here. Tell me why. So the statement that the defendant points to from the January, the defendant below pointed to one statement on January 13th, which was, please do this for me, brother. What we know is at the time, by the time the defendant said, by the time Mr. Yoon Soo Lee said that, please do this for me, brother, the defendant had already agreed five times to take the money. Well, let's parse out the January 6th call, which is really where at least the cooperating witness part of this starts, at least that part of the investigation. So you have, the transcript's not paginated, but it looks like one, two, three, four, I think on page five. Okay. Mr. Yoon Soo says, big brother, you know, I got injured. This is after talking about all the things that have happened to him. So like Eugene before, either to you or to Eugene, I am asking for help. I will do it. I don't like being a problem. You know that I, from the beginning, don't like to cause problems. And he says, I know, I don't like you to cause problems. He doesn't take the bait on the money. Then again, number two, Yoon Soo says, so can you do it? Then I will do it starting next week. The business is really bad. There haven't been any customers since yesterday. Rumors also. So if you want it, I'll give it to you. If Eugene wants it, I'll give it to you. He doesn't take the bait. He says, want what? Want what? Remember, this is after telling him to pay in December. So he says, I don't know what you're talking about. And then he says, right after that, the $500 that I'll give to you. And he says, oh, the money you were preparing to pay the partnership. He doesn't say the money for protection or anything else. He's talking, as your opposing counsel said, about a potential business relationship. And then he says, Yoon Soo ignores that and says, give it to Eugene. And then he says, Yoon Soo, I'm going to tell you this because I'm really concerned for you, really. I, this money management, I don't care. I don't know. It's not mine. So then there's more and more conversation. And only two pages later do we get the big brother, please help. I'll give you the $500. And he says, so the $500, since you were having difficulty, if you wanted to give me the $500, I'll give it to you or to Eugene. So that's the fifth time he's asking. And only then does he say, okay, I will help you so as not to cause the problems that you were talking about. How is that not some evidence of inducement, again, absent what happened in December? Right. So the legal question is whether or not there was some evidence that the government created a substantial risk. And this Court has given us different factors. And one of those, to speak to your concern, Your Honor, this is what we look at. Was there evidence that several attempts at setting up the illicit deal had failed and that on at least one occasion the defendant had directly refused to participate? So it is our argument that when the defendant says, I, this money management, I don't care, I don't know, that does not constitute a direct refusal. And consistent with that is the very next page. The defendant says, okay, I'll do it. And in that same phone call, the defendant says, okay, I'll do it four times. And then on January 13th, so that call happened on January 6th. The quote you did from our case law that was only one way, meaning what we've said is one way to prove this is if there's multiple offers and a refusal and then continued offers. But there are other ways, right? There are other ways. Is appealing to my business is bad, I've been beat up a second time now, things are bad for my family, which is what the tenor of this conversation is. And then after the fifth time of being asked, ultimately agreed. Could that not be seen as the mild persuasion that the case law also talks about? So it's true, Your Honor, that case law does say that examples of government pressure of skillfully applied could constitute that inducement. And some examples. And appealing to human kindness also we've said. It is. And you look at the record as a whole, the examples where courts have found that that artfully applied pressure simply don't match what happened here. So I can give you some examples of that. So in Jacobson, which is the quintessential Supreme Court case on predisposition, the Supreme Court said that this was not proper, where the government agent was urging the defendant to, I guess, purchase, I'm assuming child pornography, and they were telling the defendant, you will be joining in a fight against censorship and the infringement of individual rights and sort of appealing to this higher good. In Brown, which is an Eleventh Circuit case, this court said that this was not proper, when the government informant told the defendant that her friend was in trouble with Colombian drug lords and that they needed the defendant's help to save her. We just don't have that level of article manipulation. What's the closest case factually to this case? So there is a case, as far as the phrase, this money management, I don't care, I don't know, this court in United States v. Jergy, and I'm sorry, I know I'm mispronouncing that, G-J-E-R-G-I, the defendant said, I don't know, and this court said that that is not tantamount to a direct refusal. When the sympathy arises in this context, it arises because the victim has been beaten up, who is responsible for the event where that happened? John Kim and Eugene Chung. I want to add in the December call now, so I've been asking you questions, taking it out. I'm sorry, the December meeting. So we add in the December meeting the quote I had about, go ahead. Sorry, the assault? The assault. December 16th, okay. That's right. December 16th of 2009. Okay. So add that in. There, the statement is, pay Eugene and it will be fine. And here, the offer seems to be much different, which is, I want to give the money to you, you can take it, he can take it, you can split it, and that seems to be the tenor of all the conversations in January, which is, I'll give the money and I just don't want any problems, and you can do what you want with it. That seems to be quite different, doesn't it? Well, this is, again, an aiding and abetting charge, as came out in opposing counsel's argument. And so we have that legally. Factually, we also have evidence that this was a gang, that they worked together. Patrick Lee testified that whenever money was involved, John Kim got involved because he was the hyung, the older brother. He took a portion of all the money that Eugene Chung got. And so by the defendant saying, just pay, just pay to Eugene and everything will be fine, he's aiding and abetting and he's also benefiting in that. He's not talking about a foreclosure on the bar, is he? He's talking about everything's going to be okay after the man's just been beaten up. Been beaten up extremely violently with a gun in his mouth, and he was punched, his nose was broken. And then we have the defendant's own words about protection. After this violent assault, we know that another gang came in. This was a man named Chul Ahn, and his quote-unquote crew went to Gabin, attacked him so badly that an ambulance had to come, and Mr. Yoon Soo Lee was brought to the hospital. And when Yoon Soo Lee is talking to the defendant, the defendant says, after the payment, the defendant says, okay, Eugene is protecting you, Eugene is protecting you. And on January 14th, this defendant actually calls Chul Ahn and says, he's relating this to Yoon Soo Lee, and he says, I called Chul Ahn. I told him, what are you doing? You need to step back. Are you sure you really want to do this? Don't do it. Stop here because Eugene is protecting. There's no doubt, to me at least, that there's sufficient evidence. It's not that. It's the initial part, not the later things that happen. If I can switch for a second to the transcript. Is your opposing counsel correct that we presume prejudice in this case? Exhibit 15, Part 2 and 3. That's right. That, based on, yes, after our Rule 28J letter, we are, yes, and we are proceeding only on our argument that there was, that there was harmless gangs. I understand. If we presume prejudice, though, how do we get to a harmlessness finding? We're presuming it. Well. And how has that been overcome? That, the presumption is below, and then the government rebutted that, and we rebutted it exactly the way the district court found, that the prejudicial portions of Part 2, the arguably prejudicial portions that the defendant points to were minimally prejudicial. Combine that with the overwhelming evidence. How can conviction of prior, or how can admission of prior crimes, which otherwise would not have come in in this case, as I understand, and were, I think, maybe explicitly excluded in the 404B conversations? Well, this actually would have been admissible because they are part of the conspiracy count. Because they're part of the conspiracy count. Furtherance of the conspiracy. That's absolutely right. And they were irrelevant to Count 1, and we saw lots of evidence that came in without objection that were relevant to Count 1, such as Special Agent C.S. Kemm testified without objection that the FBI knew about this gang, so the Parts 3 of which the defendant takes issue with, he says, I was on the FBI list. We have an FBI agent testify at trial. We knew about these guys. And guess what? I purchased drugs from them, and I tried to purchase firearms from them. And they told me about their extortion activities, and we actually engaged in an undercover extortionist operation. I see my time is up. Thank you, Ms. McBath. Thank you. Mr. Finlayson. My opposing counsel argues that these are not prejudicial transcripts. The problem we have, or a problem that's in these transcripts, is we have third-party hearsay. We have speakers that are never identified. My client's right to cross-examine about these matters was totally eviscerated because we never had an opportunity to ask questions of those speakers. There's a J.W. listed in transcript Part 2. There's a J.H. I think one is Jen Ho. I have no idea who J.W. is who's talking about being shot. And the implications are the government would suggest and argue very broadly that everything in these transcripts related to the conspiracy, but the fact is there was absolutely no proof of that, and my client was denied a Sixth Amendment right to challenge that presumption because these transcripts were never brought to light of day. Part 2, with all due respect, Part 2 did contain prejudicial material. It talked about drug usage at the very end of Part 2. There's this discussion where John Kim is saying so-and-so must be an informant, and he asked me for 20 ounces of cocaine that he wanted to trade for methamphetamine. So Part 2 has drug conversations. In Part 3, we have my client talking about doing cocaine and that he only stopped when he came out of jail. And that evidence would never have been introduced. That's sort of quintessential bad character evidence that he was in jail long enough that he stopped doing cocaine. That is sort of a prior conviction or prior time in jail is the type of thing that is sort of archetypical bad character evidence that should not be introduced to a jury. We've heard repeated conversations about, oh, the overwhelming evidence and that this was a gang. This gang had no name. I dispute completely that John Kim was a leader. They had no ritual. They had no handshake. They had no dues. These were a bunch of guys that got together and got drunk and did stupid things. This is not a gang in the traditional sense at all. And the idea that John Kim was a leader, you remember after January the 21st, John Kim was not seen with these individuals for an entire year thereafter. The FBI agent embedded himself with Eugene Chung and his group. John Kim was never there. He's there over a year. This conspiracy went for over a year and a half, and John Kim is never in the picture. He is not there. As far as the counts five and six, the extortions, John Kim never asked, never encouraged, never went to Yung Su and said pay this money. It was always the other way around. The evidence is pretty overwhelming, though, of his involvement in these schemes, inducement and entrapment aside. You have it on tape. They have money on tape, money exchanging on tape. We have money exchanging on tape that the informant put in my client's hand and begs him to take it. Yeah, to stop having him beat up. The money was to pay for Cobb Inn. Otherwise, Cobb Inn, who gets a bar for free? The jury didn't believe me. Counsel, the only discussion these transcripts are about, I'm getting beat up. I wanted to stop. I got beat up by this other person. You promised me protection. Please help me. Please help me. That's exactly what the request that came repeatedly is, please help me. Chul On, and this came out in the trial, Chul On used to own Cobb Inn back and worked with Yung Su. There is a prior relationship back there that God knows what it's about. But the battles with Chul On, I mean, the government lumped every conflict and everything that ever happened to Yung Su. They tried to put it at the feet of John Kim, and that is just not fair. The man wasn't trapped. We presented enough evidence to get the jury. This should have been a jury question. It's clear as day. The jury should have been allowed to consider it. They never had a legal framework when they never had the proper instruction to know what to do with the idea. Thank you, Mr. Finlayson. I know you were court appointed, and we appreciate you accepting the appointment and discharging your responsibility very well this morning. Thank you. Thank you, sir.